UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
─────────────────────────────────────

JUSTIN PIMSNER and KAREN PIMSNER,

                Plaintiffs,

           v.

NEXEN TIRE CORPORATION, GOODYEAR TIRE &
RUBBER COMPANY a/k/a GOODYEAR WESTERN
HEMISHPHERE CORPORATION,

                Defendants.

─────────────────────────────────────

**Case No.: 03-CV-1373
(TJM/DRH)**

**PLAINTIFFS' MEMORANDUM OF LAW IN RESPONSE TO NEXEN TIRE
CORPORATION'S MOTION TO PRECLUDE PLAINTIFFS' LIABILITY
EXPERT, DAVID OSBORNE AND RULE 56 MOTION FOR SUMMARY JUDGMENT
(REDACTED VERSION)**

SIMON & LUKE, L.L.P.
2929 Allen Parkway, 42nd Floor
Houston, Texas  77019

BOND, SCHOENECK & KING
Office and P.O. Address
111 Washington Avenue
Albany, New York  12210-2211
Telephone:  (518) 533-3000
**Attorneys for Plaintiffs**

Of Counsel:
Ron J. Simon
John C. Ramsey
Arthur J. Siegel
Lynn C. Welthy

# I.   PRELMINARY STATEMENT

Nexen Tire Corporation ("Nexen") filed a motion to preclude the testimony of Plaintiffs' tire expert, David Osborne.   The motion should be denied for the following reasons:

- Osborne's opinions concerning tire failure analysis have never been excluded or limited by any state or federal court;

- Osborne is qualified to render opinions regarding the cause of the subject tire's failure based on the education, experience, training, skill and knowledge he obtained during his 35-year career with Avon Tyres;

- Osborne employed the same methodology to determine the cause of this tire failure as he used while employed at Avon Tyres;

- Osborne's opinions are supported by a wealth of industry publications and test data, and admissions by Nexen's documents, corporate representative, and retained tire expert;

- There is a direct correlation between the evidence Osborne has relied upon and the conclusions that he has drawn; and

## II.  FACTUAL BACKGROUND

On August 26, 2002, Justin Pimsner was traveling on I-87 near the town of Half Moon, New York.   Justin was towing his team of ten polo ponies in a trailer behind his Ford F-350 pick-up truck.   As he was traveling down the northway, the tread on his left front tire suddenly detached, causing the truck to veer immediately left.   Justin's truck left the roadway, traveled down the steep embankment, and struck several large trees.

As a result of the tire failure and ensuing collision, Justin suffered severe, life-threatening injuries.   Two of his horses were killed in the collision and several others had to be euthanized either at the scene or within twenty-four hours of the accident.

Plaintiffs filed this lawsuit against Nexen, alleging that the tire was defectively

- 2 -

manufactured and designed.  To assist the jury with the technical nature of this case, Plaintiffs hired David Osborne, an international tire expert with 35 years experience in the tire industry.

Nexen now seeks to exclude Osborne's testimony by claiming that: (1) he is not qualified to testify in this case; (2) his opinions are not relevant; and (3) his opinions are not reliable.

### III.   *DAUBERT* AND ITS PROGENY ESTABLISH THE REQUIREMENTS FOR EXPERT TESTIMONY

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, then a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of opinions to assist the trier of fact.   FED. R. EVID. 702.   In *Daubert v. Merrell-Dow Pharmaceuticals*, the Supreme Court concluded that in order to testify under FRE 702, an expert's opinions must be (1) scientifically trustworthy or reliable and (2) relevant to the issue at hand.  *Daubert v. Merrell-Dow Pharmaceuticals*, 509 U.S. 589, 593 (1979).

When analyzing an expert's testimony, the court should focus on the principles and methodology upon which the expert relies.   *Id.* at 592-593.   In performing this analysis, a court may utilize the following factors:

1.      Whether the opinion has been tested;

2.      Whether the opinion has been published and peer reviewed;

3.      Whether the opinion has a known potential rate of error; and

4.      Whether the opinion is generally accepted within the industry.

*Id.* at 591-592.

- 3 -

As a general rule, the expert's testimony should be excluded "[o]nly if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury." *Daubert*, 509 U.S. at 594-95.  A review of *Daubert's* progeny "shows that the rejection of expert testimony is the exception rather than the rule."   Advisory Committee Notes, 2000 Amendments, FED. R. EVID. 702; *see also Travelers Property Cas. Co. v. General Elec. Co.*, 150 F. Supp. 2d 53, 57 (S.D.N.Y. 2001).

In the Second Circuit, the standard for admissibility of expert testimony is "**especially broad.**"  *Clarke v. LR Systems*, 219 F. Supp. 2d 323, 332 (S.D.N.Y 2002) (emphasis added); citing *Boucher v. United States Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (holding that testimony is to be admitted unless purely conjectural or based on totally unfounded assumptions); *see also Zuchowicz v. United States of America*, 140 F.3d 381, 387 (2d. Cir 1998); *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1045 (2d Cir. 1995).

## IV.  OSBORNE'S QUALIFICATIONS AND METHODOLOGY SATISFY *DAUBERT*

### A.    Osborne is clearly qualified

In its motion, Nexen disingenuously claims that Osborne is not qualified to offer expert testimony because he lacks the requisite education and experience.

Osborne has extensive education, training, knowledge, skill and experience concerning all areas of tire manufacture, design, architecture, components, engineering, performance, testing and failure analysis.  He is far more qualified than even Nexen's expert to testify in this case.   The following is a general summary of Osborne's

qualifications, as set out in greater detail in his affidavit.[1]

- He was employed by Avon Tyres in the United Kingdom continually from 1964 through 1999 where he received specific training in tire engineering, construction, design, manufacture, chemical composition, and testing;

- He has spent his career analyzing and studying tire failures, including tread separations, on radial tires of various designs for both Avon and numerous other international tire manufacturers;

- He has examined and performed failure analyses on more than 8,000 tires in his professional career;

- He spent years consulting with other tire manufacturers in their production and design processes which includes: development of new tires, testing of new tires, development and modification of tire processing specifications, advice on tire building machinery, inspecting failed tires, and training others in the inspection of failed tires and training others in the inspection of failed tires;

- He is a member of three learned industry societies: (1) the Institute of Materials of Great Britain, (2) the American Chemical Society of America, and (3) the Royal Society of Chemistry of Great Britain;

- He was formally educated in England in the subjects of physics, mathematics, chemistry, rubber compounding, rubber chemistry, rubber processing, technology, and polymer engineering;

- He holds an official "Determination of Expertise" from the State University of New York stating that he has attained the academic equivalent of a Bachelor of Science degree in Materials Engineering from an accredited institution of higher education in the United States;

- He completed a two-year training program and obtained a BETC Certificate in polymer engineering. During this time, he gained extensive knowledge regarding rubber and plastic chemistry, rubber and plastic processing, and rubber and plastic compounding; and

- He has authored numerous design specifications, policies,

---

[1]   The Affidavit of David Osborne and the thirty-eight (38) Exhibits attached thereto are submitted with this Memorandum of Law.

procedures, and technical papers on tire design and tire technology.

Affidavit of David Osborne, ¶¶ 2-13, 16-20.

Based on the above, Osborne clearly holds "specialized knowledge" gained through "experience, training or education" and thus meets the standard outlined in both Federal Rule of Evidence 702 and *Daubert*.

**B.    Nexen does not challenge Osborne's methodology**

*Daubert* requires that the focus of an expert's opinions "be solely on principles and methodology, not on the conclusions they generate."   *Daubert,* 509 U.S. at 594. Nexen does not even attempt to challenge Osborne's methodology.   The reason is simple – Osborne employed the same methodology in this case as he utilized while analyzing over 8,000 failed tires during his career as a tire analyst.

## V.    OSBORNE'S OPINIONS ARE RELIABLE AND RELEVANT

As set out in detail in Osborne's Affidavit, he performed a detailed visual and tactile inspection of the subject tire and recorded his observations as part of his report. Affidavit of David Osborne, ¶ 23.  He analyzed his observations in light of his 35 years of experience in the tire industry, consulted voluminous texts on the subject, and even studied Defendants' own internal documents concerning the meaning and import of his observations.   Affidavit of David Osborne, ¶ 24.   After ruling out numerous possible explanations for the tread separation, he formed the following conclusions:

1.    The innerliner on the subject tire is too thin;

2.    The amount of halobutyl rubber used in Nexen's innerliner formula is deficient;

3.    The tire has insufficient adhesion between the skim rubber

- 6 -

and the steel belts; and

4.      The tire is defectively designed because Nexen omitted a full
        nylon cap ply.

Affidavit of David Osborne, ¶ 29, 32-33.

### A.      Nexen's innerliner is too thin

It is well settled within the tire industry that water vapor and oxygen can permeate into the internal components of a tire through the innerliner.  Affidavit of David Osborne, ¶  34.  When the permeation is excessive, the permeation can cause the adhesion between the internal components to degrade.  Id.  Even Thomas Dodson, Nexen's retained tire expert, agrees with these fundamental principals of tire failure analysis.  Affidavit of David Osborne, ¶ Id.

To combat permeation, tire companies (1) increase the thickness of the tire's innerliner, and (2) increase the concentration of less-permeable, halobutyl rubber in the innerliner's skim formula.  Affidavit of David Osborne, ¶ Id.

Osborne concluded that Nexen's tire was defectively manufactured because the innerliner on the subject tire measured below Nexen's own specification of XXX[*] numerous areas throughout the tire.  Affidavit of David Osborne, ¶ 38.  According to Nexen's corporate representative, D.Y. Shin, any tire that fails to meet Nexen's specification must be discarded.  Deposition of D.Y. Shin, at 78.[2]

Osborne also concluded that the innerliner gauge specification is defective because it is too thin for a light truck tire of this size.  Osborne based his opinions on the

---

[*]    References confidential information, which is subject to confidentiality agreements and protective orders.  The information under "XXX" will not be filed with the clerk but is being submitted to this Court separately.

[2]    The deposition of D.Y. Shin is attached to David Osborne's Affidavit as Exhibit A-8.

155261.1 4/8/2005

following:

  1. Industry testing data analyzing the effects of air permeation through tires with varying degrees of innerliner thickness. Affidavit of David Osborne, ¶ 46;

  2. His personal experiences at Avon in testing permeation rates of tires of varying degrees of innerliner thickness.  Affidavit of David Osborne, ¶ 43; and

  3. Comparisons to an exemplar tire of similar construction. Affidavit of David Osborne, ¶ 44-45.

**1.     Industry data**

Osborne relied upon numerous industry peer-reviewed, published studies to support his innerliner opinions.  One such study is titled "*Effect of Intracarcass Pressure Buildup on Tubeless Tire Performance*.  Affidavit of David Osborne, ¶ 46.  This study was presented to the Division of Rubber Chemistry of the American Chemical Society. Id.  In the study, the authors tested the permeability rates of five different tires with varying innerliner thickness ranging from .0355" (.90170 mm) to .0545" (1.38430 mm). Id.  The test results revealed that as innerliner thickness increased, permeation rates decreased.  Id.  The authors concluded that using a thicker gauge not only minimized permeability, but also eliminated tread separations that were observed on tires with thinner innerliner gauges.  Id.

**2.     Personal experience**

Osborne also relied upon his experience, education, knowledge, training and skill during his 35-year career as a tire failure analyst.   During his tenure at Avon, Osborne, along with Avon's rubber compounders, performed testing on steel belted radial tires to determine the effect of permeability.  Affidavit of David Osborne, ¶ 43.  In the tests,

- 8 -

sample tires were used to determine the correlation between an innerliner's thickness and the rate of permeability of oxygen into a tire's carcass. As explained in his affidavit, Osborne's experience confirmed that as innerliner thickness increases, permeation into the tire structure decreases. Affidavit of David Osborne, ¶¶ 43, 52-53.

### 3. Comparisons to an exemplar tire

Osborne also located an exemplar tire that shared a similar construction to the Pimsner tire. He cross-sectioned the tire in order to analyze and measure the tire's internal components using the same methods he employed while analyzing tires for Avon. Affidavit of David Osborne, ¶ 40, 44. He then measured the innerliner using his calibrated digital caliper gauge and x7 magnifying lens. The innerliner on the Michelin exemplar measured XXX, more than double the thickness of Nexen's specification. Affidavit of David Osborne, ¶ 44.

### B. Nexen's innerliner formula lacks enough halobutyl rubber

Osborne also concluded that the subject tire lacks a sufficient amount of halobutyl rubber in the innerliner formula. Affidavit of David Osborne, ¶ 47. In support of this conclusion, Osborne relied on the following:

1. Industry test data showing the effects of air permeation through tires with varying percentages of halobutyl rubber in their innerliner formula. Affidavit of David Osborne, ¶ 49;

2. His experience at Avon testing innerliners with varying percentages of halobutyl rubber. Affidavit of David Osborne, ¶ 50; and

3. His knowledge of the current percentages of halobutyl rubber used by other tire companies. Affidavit of David Osborne, ¶ 51.

### 1. Industry data

155261.1 4/8/2005

When determining that Nexen's innerliner formula lacks a sufficient amount of halobutyl rubber, Osborne relied upon multiple industry publications, including a peer-reviewed presentation from Exxon chemists at the 1994 International Tire Exhibition and Conference ("ITEC").   Affidavit of David Osborne, ¶ 49.   In the study, the chemists analyzed the correlation between an innerliner's chemical composition and the innerliner's permeability rate.  Id.  The chemists tested three innerliners compositions in their study:

a.      XXX halobutyl rubber;

b.      XXX halobutyl rubber and XXX natural rubber; and

c.      100% natural rubber.

The tests revealed that an innerliner of XXX halobutyl rubber and XXX natural rubber XXX allowed three times the permeation of a tire with XXX halobutyl rubber.  Id. Because of this result, the authors recommended that tire manufacturers maximize the amount of halobutyl rubber in their innerliner formulas.  Id.

**2.      Personal experience**

Osborne also relied upon his experience, education, knowledge, training and skill acquired during his 35 years at Avon.   Affidavit of David Osborne, ¶ 50.   During his career, he tested innerliners with varying percentages of halobutyl rubber to ascertain the rate of permeation of oxygen and/or water vapor.  Id.  He observed and analyzed test results confirming that innerliners with less halobutyl rubber were more permeable than tires with higher rates of halobutyl rubber.  Id.

**3.      Knowledge of industry standards**

Finally, Osborne also relied upon his knowledge of other tire manufacturers'

- 10 -

innerliner formulas.   Osborne is personally aware of multiple manufacturers who presently utilize between XXX halobutyl rubber in their innerliner compositions.

> I also base this opinion on the numerous chemical analysis (reverse engineering) reports I have seen over the years that show that typically tire manufacturers use between XXX and XXX halobutyl content in innerliner formulations (recipes).   Further, I have analyzed numerous innerliners and innerliner specifications as a retained expert since 1999, and I am aware of what other manufacturers are using in their tires.

Affidavit of David Osborne, ¶ 51-52.

## C.      The tire has poor adhesion between the skim rubber and steel belts

Osborne also concluded that the subject tire is defective because there are multiple areas of poor adhesion between the skim rubber and the steel belts.   Affidavit of David Osborne, ¶ 54.   When performing his analysis on the subject tire, Osborne noted completely exposed steel cords with no visible remnants of rubber attached to them.   Id.   This is classic evidence of poor adhesion.   Affidavit of David Osborne, ¶ 55.

### 1.      Industry data

As Osborne explains, poor adhesion is the result of faulty manufacturing. Affidavit of David Osborne, ¶ 56.   These faulty conditions are usually traced back to the manufacturing plant itself whereby factory conditions caused the internal steel belts to become contaminated, resulting in insufficient adhesion between internal components. Id.

As stated in Osborne's affidavit, he also relies upon:

> 1.      Two American Society of Testing Materials ("ASTM") standards;
>
> 2.      Two US Patents authored by The Goodyear Tire & Rubber Company; and

- 11 -

        3.      Ten published, peer-reviewed articles, many of which
                were published by the American Chemical Society.

Affidavit of David Osborne, ¶¶ 54-56, 60.  These industry publications clearly establish that (1) poor adhesion between the rubber skim stock and steel belts is detectible during a visual and tactile examination of a tire, (2) poor rubber to steel adhesion results from a manufacturing problem within the manufacturing process, and (3) excessive temperature, excessive humidity, and contamination are all potential causes of poor rubber to steel bonding in a steel belted radial tire.

### 2.      Personal experience

Nexen claims that Osborne has not tested rubber to steel adhesion.  But as outlined in his affidavit, Osborne conducted multiple adhesion tests while employed at Avon.  Affidavit of David Osborne, ¶ 61.  The purpose of these tests was to ascertain the level of adhesion between the skim rubber and the steel belts on Avon's steel belted radial tires.  Upon analyzing adhesion levels, Osborne drew conclusions concerning Avon's manufacturing processes and forwarded recommendations to his peers to improve quality assurance within the plant.  Affidavit of David Osborne, ¶ 60.  He employed this methodology when examining the adhesive deficiencies in the subject tire.

### 3.      Nexen's policies and procedures

During discovery of this case, Nexen produced its policies and procedures for its plant personnel which include internal quality controls that monitor conditions or contaminants that could adversely affect adhesion during the manufacturing process. These policies require that Nexen XXX.  Deposition of D. Y. Shin, at 120-121, 123-124.

155261.1 4/8/2005

At the time of this response, Nexen's employees who were working in the factory where this tire was manufactured have not yet been deposed.  Per Order from this Court, these employees are to be deposed in Houston, Texas before April 29, 2004.  Once these depositions take place, Osborne will be able to study this testimony and comment on the possible contamination sources.

### 4.    Osborne's opinion concerning adhesion is relevant

Nexen further claims on pages 10-11 of its motion that Osborne's adhesion opinions are irrelevant, and therefore inadmissible.  Specifically, on page 10-11 of its motion, Nexen claims that "Mr. Osborne testified at his deposition that the alleged poor bond [between the rubber and steel belts] was caused by the allegedly thin innerliner, not as a result of improper bonding of the skim stock rubber to the steel wires."  In support, Nexen cites the following testimony from Osborne's deposition:

> Q:    Do you know what the air loss permeation rate has to be in a tire for it to break down the bonding of the rubber to the steel cords?
>
> A:    Not in terms of a number that I could give you, no.

Deposition of David Osborne, at 83.[3]

Plaintiffs are puzzled at how, in Nexen's mind, the above-noted testimony equates to an admission by Osborne's that the poor adhesion was not the result of improper bonding of the skim stock rubber to steel wires.  In fact, Osborne is not even discussing adhesion in this deposition reference.

Although Osborne is certain that there is a lack of adhesion in the tire (it is obvious from even a cursory glance, he does not know exactly what type of

---

[3]    The Deposition of David Osborne has previously been submitted to Court as Exhibit D to the Affidavit of John Ramsey filed in support of Plaintiffs' Motion to Exclude Testimony of Defendant's Expert, Thomas Dodson.

manufacturing problem caused the poor rubber to steel adhesion in the subject tire. Osborne does know that according to ASTM standards, Goodyear's patents, and multiple articles published throughout the tire industry, that poor adhesion is the direct result of inadequate quality control and inferior manufacturing conditions at a tire plant. In assessing a failed tire that shows evidence of poor adhesion, the evidence itself is enough to enable a tire analyst to opine as to the cause of the failure.  (i.e. poor quality control within a tire factory).

Nexen, however, argues that because Osborne cannot identify exactly what conditions in Nexen's plant caused the poor adhesion, his opinions are inadmissible. Nexen's argument would support that Osborne provide the identity of the employee who touched the treated steel wires with his bare hands and the date on which it occurred. Nexen's argument grossly exceeds the standard of proof within the industry.

More importantly, Nexen should not be allowed argue that Osborne is unfamiliar with the plant conditions in Nexen's South Korean plant because Nexen has prevented Plaintiffs from discovering this evidence.  As previously noted, Nexen has not produced its factory workers for deposition in this case.  Per Order from the Court, all of the creel room employees will be deposed by April 29, 2005.  Prior to that date, Nexen should not be allowed to argue that Osborne lacks sufficient evidence to opine as to the specific cause of the poor adhesion in this tire.

**D.     Nexen's tire lacks a full nylon cap ply**

Osborne's final opinion concerning the subject tire is that the tire is defective in its design because it lacks a full nylon cap ply.  A cap ply in this tire would have inhibited the start of the failure, retarded the growth, and more likely than not, averted the

- 14 -

catastrophic accident.  Affidavit of David Osborne, ¶ 61.  This opinion is supported by numerous authoritative texts, publications, and patents within the industry as well as Osborne's direct, personal involvement with the implementation of cap plies into the design of steel belted radial tires at Avon Tyres.

**1.     Industry data**

Osborne relied upon numerous publications in rendering his cap ply opinion, including:

> 1.    Ten US Patents written by North American and international tire companies such as Goodyear, Bridgestone, and Uniroyal;
>
> 2.    Published, peer-reviewed articles written by individuals such as the Vice President of Tire Technology for Uniroyal Tire Company; and
>
> 3.    Deposition testimony from B.A. Robinson, Goodyear's senior tire engineer in *Frankl v. Goodyear Tire & Rubber Co.*

Affidavit of David Osborne, ¶¶ 65-76, 78.

The overwhelming amount of data in the references above proves that the tire companies uniformly agree that cap plies prevent tread separations.  As a result, the vast majority of tire companies have incorporated full cap plies into their designs. Affidavit of David Osborne, ¶¶ 62, 66-76.

**2.     Personal experience**

As noted in his Affidavit, Osborne designed, engineered and tested tires with and without cap plies while employed at Avon.  Affidavit of David Osborne, ¶¶ 62, 77, 79. He was also responsible for implementing the full nylon cap ply into the design of Avon's steel belted radial tires.  Id.  He based his decision to incorporate the full cap ply

- 15 -

into Avon's design on test results both at Avon and other manufacturers' facilities whereby tires with full nylon cap plies significantly outperformed tires without full cap plies.   Id.   Because of this testing, Osborne witnessed first hand that cap plies significantly reduced the incidents of tread separations in steel belted radial tires.  Id.

Osborne's personal involvement with the cap ply initiative at Avon Tyres qualifies him to render his opinion concerning Nexen's omission of a full cap ply from the subject tire design.  His observations and test results from his testing at Avon and multiple other manufacturers' facilities prove that cap plies are implemented in steel belted radial tires for 2 reasons: (1) to improve the durability of the tire, and (2) to decrease the risk of tread separations.  Id.

### 3.      Nexen's admissions

Aside from voluminous industry data and his personal experiences with cap plies, Osborne also relied upon Nexen's own admissions, including:

1.   **XXX;**

2.   One of the reasons a cap ply was inserted into the tire's design was based on concerns within the production team over the uniformity passing rate of Nexen's LT235/85R16; and

3.   Cap plies were technologically and economically feasible at the time the subject tires was manufactured in January of 2000.

Deposition of Kyung-Woo Cheon, at 9, 11.[4]  These admissions, when combined with the industry publications and Osborne's experience, prove that Osborne's cap ply opinion is reliable and thus satisfies *Daubert*.

---

[4]   The deposition of Kyung-Woo Cheon is attached as Exhibit A to the Affidavit of John Ramsey, dated April 8, 2005.

155261.1 4/8/2005

## VI. OSBORNE HAS FULLY SATISFIED *DAUBERT*

**A.      Osborne's opinions have been tested**

The standard for admissibility under *Daubert* is whether the opinion "can be or has been" tested.   *Daubert*, 509 U.S. at 593.   Osborne's theories and opinions regarding the innerliner thickness, the concentration of halobutyl rubber in the innerliner, the lack of adhesion between the rubber skim stock and the steel belts, and the absence of a full nylon cap ply are not only testable, but have been tested by Osborne at Avon Tyres during his 35 year career.  Osborne authorized, participated in, observed, and/or supervised the tests and analyzed the test results.  The results were then used to improve the quality and safety of Avon's tires and the tires of other manufacturers with whom Osborne worked.

In its motion, Nexen routinely states that Osborne is not qualified to render his opinions because he hasn't performed innerliner permeation testing, adhesion testing, or cap ply durability testing on the exact tire in this case – a **Nexen** LT235/85R16.  This simply is not required by the *Daubert*.  As previously stated, *Daubert* requires that the opinion "can be or has been tested." *Id.*  Because Osborne's opinions have been tested on tires of similar construction while working for a tire manufacturer, he has satisfied the "testing" requirement of *Daubert*.  *See* Freitas v. *Michelin Tire Corp.*, 2000 WL 424187, at 2 (D. Conn. 2000) (admitting an expert's opinion on alternative design in a burst tire case because expert had conducted numerous burst tire tests on tires and reviewed burst tire tests by other experts); *Jarvis v. Ford Motor Co.*, 1999 WL 461813, at 4 (S.D.N.Y. 1999)(admitting expert's testimony in design defect case where expert's theory had been tested on a model with similar electrical components as the subject

- 17 -

vehicle); *see also McCullock v. H.B.* Fuller, 61 F.3d 1038, 1043 (2d. Cir. 1995) (holding that an expert with years of experience testing, studying and working around industrial ventilation systems was qualified to testify about "zone of danger" and fumes emitted from an unventilated glue pot).

Notwithstanding the above, this Court should not allow Nexen to argue that Osborne's opinions have not been sufficiently tested because he has not performed tests on a Nexen YKS LT235/85R16.  As previously mentioned, Nexen changed the design of the YKS LT235/85R16 in December of 2000, eleven months after the Pimsner tire was manufactured.  The design included the installation of a full cap nylon ply. Because of this design change, Plaintiffs requested an exemplar tire manufactured by Nexen before December 2000 in order to perform tests on a tire with the exact construction as the subject tire. Nexen refused to produce one.  *See* Nexen's Response to Plaintiffs' Request for Production Number 144.[5]  Plaintiffs recently learned that Nexen provided 10 exemplar tires to its accident reconstructionist, C. Bruce Gamberdella. Deposition of C. Bruce Gambardella, at 19.[6]  Upon discovering this information, Plaintiffs immediately requested that Nexen provide the make, model, size, and D.O.T. identification numbers for each exemplar tire.  To date, Nexen has refused to produce the tires or the requested information.  *See* correspondence to Nexen's counsel from Plaintiffs' counsel dated April 6, 2005.[7]

---

[5]  Nexen's Response to Plaintiffs' Request for Production is attached as Exhibit B to the Affidavit of John Ramsey, dated April 8, 2005.

[6]  The deposition of C. Bruce Gambardella is attached as Exhibit C to the Affidavit of John Ramsey, dated April 8, 2005.

[7]  Correspondence from Ron Simon to Michael Bai is attached as Exhibit D to the Affidavit of John

- 18 -

155261.1 4/8/2005

Accordingly, this Court should not reward Nexen's discovery tactics by excluding Osborne's testimony just because he hasn't tested tires that Nexen refuses to provide.

**B.    Osborne relies upon peer reviewed and published literature and his opinions have a known rate of error**

Contrary to Nexen's assertions, Osborne relies heavily upon industry publications in forming his opinions, including upon peer-reviewed, published articles, chapters, journals, patents, and depositions from other cases.  When analyzing the literature upon which an expert relies, one indicia of reliability is whether the expert relies on federal design and performance standards or publications published by independent standards organizations.  *Milanowicz v. The Raymond Corp.*, 148 F. Supp. 2d 525, 532-33 (D.N.J. 2001).  Osborne did rely upon the following publications when rendering his opinions in this case:

1.    Published standards from the American Society of Testing Materials (ASTM).  Affidavit of David Osborne, ¶ 55;

2.    Published test results and articles from the American Chemical Society, Rubber Chemistry and Technology Division.  Affidavit of David Osborne ¶ ¶ 54, 60, and 78; and

3.    Countless US Patents, filed by tire companies, on file with the federal government.  Affidavit of David Osborne ¶ ¶ 60 and 78.

In many of these publications, the authors make the potential error rate known and factor this potential rate of error into their analysis.  Because these publications are accepted within the tire and rubber community, the authors have survived peer review scrutiny.  Furthermore, while working with Avon engineers and employees, Osborne

---

Ramsey, dated April 8, 2005.

155261.1 4/8/2005

ascertained and evaluated the potential rates of error while conducting tests on innerliners, adhesion and cap plies.

**C.     Osborne's opinions are generally accepted within the tire industry**

Nexen claims than Osborne's opinions are not generally accepted within the tire industry.  This argument is meritless based on the following evidence, as offered in Osborne's affidavit:

1.    Nexen's retained expert agrees with fundamental principles relied upon by Osborne in forming his conclusions.  Affidavit of David Osborne ¶ 34.

2.    Osborne has relied upon tests and test data that he observed, analyzed, and/or performed while employed at a tire company.  Affidavit of David Osborne ¶ 19; and

3.    Osborne relied upon industry publications, published by tire companies or renowned leaders in the tire industry in forming his opinions.  Affidavit of David Osborne ¶¶ 46, 49, 53, 55-56, 60, 65-76, 78.

Because all of the evidence upon which Osborne relies either came from his experiences within the tire industry or the tire industry itself, his opinions are obviously accepted within the industry.

**VII.    SUMMARY JUDGMENT SHOULD BE DENIED**

Nexen has also moved for summary judgment in anticipation of the exclusion of Osborne's testimony.   There are no other grounds for summary judgment listed in Nexen's motion.  Because Osborne is qualified to render his opinions in this case and because his opinions are reliable, he should be permitted to testify.  With his testimony, Plaintiffs have established *prima facie* evidence of multiple manufacturing and design defects in the tire.  Accordingly, summary judgment should be denied.

## VIII.   CONCLUSION

Mr. Osborne has relied upon his 35 years of direct experience in the tire industry designing, manufacturing, testing, and analyzing failed tires.   He cites dozens of authoritative texts and materials which explain his observations and support his opinions.   His opinions are also supported by testimony from Nexen's own corporate representative, retained tire expert, and documents.

Accordingly, Plaintiffs respectfully request that the Court deny Nexen's Motion to Exclude the Expert Testimony of Plaintiffs' Expert, David Osborne, and deny Nexen's Rule 56 Motion for Summary Judgment.

Dated:  April 8, 2005

SIMON & LUKE, L.L.P.

s/John C. Ramsey

By: _____

Ron Simon
Texas Bar No. 00788421
John C. Ramsey
Texas Bar No. 24027762
2929 Allen Parkway, 42nd Floor
Houston, Texas 77019

BOND, SCHOENECK & KING, PLLC
Arthur J. Siegel, Esq.
Bar Roll No. 102606
Office and P.O. Address
111 Washington Avenue
Albany, New York  12210-2211
Telephone:  (518) 533-3000

**Attorneys for Plaintiffs**

155261.1 4/8/2005

*155261.1 4/8/2005*

TO:   WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP
      Attorneys for Defendants
      Michael H. Bai, Esq.
      150 East 42nd Street
      New York, New York  10017-5639

155261.1 4/8/2005